## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **LYNLEY VANSINGEL,** | § | |
| **MELANIE MEYER, and** | § | |
| **JESSIE PALMER** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **4:22-cv-00525-SDJ** |
| **FIRST GUARANTY MORTGAGE** | § | |
| **CORPORATION, and PACIFIC** | § | |
| **INVESTMENT MANAGEMENT** | § | |
| **COMPANY, INC.** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE JORDAN:

COMES NOW, Plaintiffs, Lynley VanSingel, Melanie Meyer, and Jessie Palmer, complaining of Defendants, First Guaranty Mortgage Corporation and Pacific Investment Management Company, Inc., and for cause of action would show the Court as follows:

## I.
## PARTIES

1.     Plaintiff **Lynley VanSingel** ("VanSingel") is an individual who resides in Yantis, Wood County, Texas.

2.     Plaintiff **Melanie Meyer** ("Meyer") is an individual who resides in Walkersville, Fredrick County Maryland.

3.     Plaintiff **Jessie Palmer** ("Palmer" is an individual who resides in New Lothrop, Shiawassee County Michigan.

4.      Defendant **FIRST GUARANTY MORTGAGE CORPORATION** (" FGMC") is a Texas corporation with its principal office in Plano, Collin County, Texas.  FGMC may be served with process through their registered agent, National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas, 75201-3136. Defendant FGMC has been served with this lawsuit and filed a Notice of Bankruptcy on July 18, 2022.  This matter is currently stayed against Defendant FGMC. (Dock. 5).

5.      Defendant **PACIFIC INVESTMENT MANAGEMENT COMPANY, INC.** ("PIMCO"), is a California Corporation.  PIMCO may be served with process through its registered agent, Registered Agent Solutions, Inc., Corporate Center One, 5301 Southwest Parkway, Suite 400, Austin, Texas 78735. PIMCO has been served with this lawsuit and filed a Motion to Dismiss on August 9, 2022.  (Dock. 7).

## II.
## JURISDICTION

6.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331.

## III.
## VENUE

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Collin County, Texas. Additionally, Defendant FGMC's principal place of business is located in Collin County, Texas.

## IV.
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      Plaintiffs have fully exhausted their administrative remedies under Title VII and have fulfilled all jurisdictional prerequisites to the filing of these claims.  Each Plaintiff timely

filed an employment discrimination charge against Defendants with the Equal Employment Opportunity Commission (EEOC). Plaintiffs have received their respective Notice of Right to File a Civil Action from the EEOC.

## V.
## FACTS

9.      At all times relevant to this action, each Defendant had over five hundred employees.

10.      PIMCO is a 100% equity owner of FGMC. PIMCO and FGMC operate as joint employers or integrated enterprises.  Upon information and belief, PIMCO executives hold two or more seats on the FGMC board of directors and had input into the hiring and firing of FGMC executives. These same executives also authorized the filing of FGMC's bankruptcy.

11.      Upon information and belief, PIMCO knowingly allowed FGMC to be undercapitalized and/or improperly transferred assets out of FGMC causing FGMC to be undercapitalized, resulting in FGMC's recent bankruptcy filing.

12.      In mid-2020, approximately two years prior to FGMC's bankruptcy filing, the FGMC board, at the request and direction of PIMCO, hired former PIMCO employee Brian Hale, owner of MAP to be a Senior Consultant to the FGMC board.

13.      Mr. Hale attended all executive meetings and provided executive coaching to FGMC CEO Aaron Samples. He referred Jordan Simons, Tracey Fenton, and Darien Oien to their executive positions.  FGMC executives commonly talked about how Mr. Hale's people/referrals were untouchable – employees could not complain about them and they were permitted to have outlandish behavior (i.e. Jordan Simons).

14.     Through Mr. Hale, PIMCO had input into the daily operations of FGMC, including employee issues.  Mr. Hale attempted to provide coaching to Mr. Simons regarding the treatment of his co-workers.

15.     In May of 2021, Mr. Hale conducted a succession planning exercise for C-Suite & SVPs. He started sending emails to Finance and to Operations, criticizing how they were run. In August and September 2021, Mr. Hale organized the restructuring of all operations and sales compensation plans.

16.     In December 2021, Brian Hale referred Suzy Lindblom to the open position of COO. Ms, Lindholm started working closely with the FGMC board.  Around this same time, analysts from PIMCO were sent to FGMC to analyze and improve FGMC's performance.

17.     Ms, VanSingel's team provided multi-day training for these PIMCO analysts, who continued to provide guidance on operations and finance to FGMC throughout the time that the Plaintiffs were employed.

18.     Plaintiffs assert that PIMCO's guidance on FGMC's operations and finance directly caused FGMC's financial issues and undercapitalization leading to the bankruptcy filing.

A.     **Facts Relevant to VanSingel:**

19.     VanSingel is a forty-two-year-old female.

20.     VanSingel was employed as the Senior Vice President, Learning & Organizational Development at FGMC beginning on or about April 22, 2019 until her termination on February 4, 2022. VanSingel's direct supervisor was Chief Administrative Officer Dwayne Smith ("Smith"). VanSingel complained to Smith regarding the discriminatory conduct of Senior Vice President of Retail Sales, Jordan Simons ("Simons"). VanSingel entered into an Executive Agreement with

FGMC (the "Employment Agreement") on or about January 7, 2020, which set forth some of the terms of her employment.

21.     VanSingel was tasked with building the learning strategy and upgrading the talent on the team. Her strategy was highly praised, and she received a 5 (highest) performance rating for 2019 and her team won an industry award with ATD Dallas for Strategic Planning. During the mortgage refinancing boom in 2020, VanSingel's team grew to meet the demands of a growing population of FGMC team members. She continued to be praised for her performance and in 2021 during the annual leadership assessment process, she scored in the top 5 leaders amongst SVPs and VPs that were assessed.  Many other awards were given both to her personally and to her team at an industry level.

22.     In the Fall of 2021, VanSingel raised concerns to CEO Aaron Samples that while FGMC continued to invest in expanding her team, she had doubts about this fast expansion strategy.  FGMC was experiencing above industry average turnover from the C-Suite level down and she was concerned that her department was overstaffed based on the capacity models she used to staff her team. In the midst of raising concerns, she was allowed to take on the procedures team in order to further assist employees in doing their jobs.  This team grew to 5 people under her tenure and she and her procedures team delivered on the promise to create end to end retail channel procedures.

23.     On January 14, 2022, VanSingel had a pre-scheduled meeting with SVP of Retail Sales, Jordan Simons. During this meeting, Simons appeared agitated and went on to list a myriad of complaints. Specifically, he alleged that a trainer assigned to his team, Raye Jones, was unprofessional and didn't provide the type of employee experience he wanted.  He criticized her for playing rap music in class on breaks. When asked for specific other complaints, he could not

tell VanSingel anything else. Throughout the remainder of the conversation, Simons kept correcting VanSingel, telling her how to state things specifically and told her that "words matter" and the way she was speaking was undermining her credibility. As a female mortgage executive with 20 years' experience (far greater than his), VanSingel experienced that he was employing gender-based micro-aggressions in the conversation.

24.     VanSingel immediately went to Smith with her concerns about Simons. She expressed concerns about her experience, and informed him that Mr. Simons was targeting the trainer, Raye Jones, unfairly. Ms. Jones had previously been identified as a high potential employee and had also received recognition for her outstanding performance. VanSingel told Mr. Smith that she thought Simons was targeting Ms. Jones because of her status as a black, female member of the LGBTQIA+ family and that she was aware of other outstanding gender-based allegations against Simons. Upon information and belief, many other female employees have experienced gender discrimination on the part of Simons. Ms. VanSingel's concerns were not addressed because she was terminated shortly after her complaints.

25.     On January 24, 2022, Smith sent several emails stating that they needed to find a mutually beneficial way to part ways because he was disappointed in VanSingel's comments in the self-evaluation portion of her annual review. VanSingel was shocked that she was being terminated for expressing honest assessment about the past year. During the termination call on January 25, Smith told VanSingel that she was being fired for cause due to expressing frustration and the comments she made in the review. He stated he did not come to the meeting with a plan and did not give her an end date for her employment. A final meeting was held on January 28, in which where Smith confirmed that her last day would be February 4, 2022.

26.     VanSingel later learned that the decision to terminate her was made by the CEO, Aaron Samples, immediately after her complaints concerning Simons and prior to her writing the self-evaluations comments that were allegedly the basis for her termination. VanSingel's termination came less than two weeks after she had expressed concerns about Simons. VanSingel is aware of other women in the company who were terminated shortly after making complaints regarding discrimination against Simons and other male employees. VanSingel asserts she was terminated in retaliation for complaining about Simons' gender discriminatory behavior on behalf of herself and Ms. Jones.  Furthermore, VanSingel and other female employees have experienced gender discrimination, as well as retaliation for reporting gender discrimination on the part of Simons, Samples, and other male executives at the company.  Their actions have resulted in disparate treatment of female employees at the company.

**B.     Facts Relevant to Meyer:**

27.     Meyer is a forty-two-year-old female.

28.     Meyer has worked as a mortgage professional since 2002.  On February 28, 2020, Meyer was hired by FGMC to serve as a Mortgage Originator reporting to Donovan Stamps ("Stamps").  Meyer became a top performer in the region by the end of the year and received an exceeds expectations performance review in 2020.

29.     On February 1, 2021 Meyer was assigned a non-producing sales manager position. Through November of 2021, Meyer managed a team that averaged seventeen (17) loan officers and achieved the top three sales position in production and volume. Meyer's team had the lowest level of attrition of all the sales managers and Meyer received exceptional results from a survey sent to her direct reports.

30.     On December 1, 2021, Meyer was asked to head a special team for purchasing loans.  Meyer's team was reassigned and Meyer was given seven team members, a growth plan and a commitment that the company would purchase quality leads for her team.  Meyer was promised a guarantee of $10,000 on top of her $5,000 base salary through June 15, 2022.  Stamps left the company on December 5, 2021 and Meyer was assigned to report to Senior Vice President Brandon Jewkes ("Jewkes") and Senior Vice President Jordan Simons ("Simons").

31.     On January 7th, 2022 during the quarterly sales manager meeting, which was promoted as an open forum for discussion Meyer questioned some data on a report that was being shared by Simons.  The data was ranking loan officers and the information was not accurate based on operational averages. Simons raised his voice and was so rude that other sales managers sent Meyer messages apologizing for Simon's behavior. Simons later sent Meyer an apology via text after his outburst, but he did not apologize in front of the group.

32.     In late January during a scheduled one-on-one call with Simons, Meyer suggested that her team had not been receiving adequate leads since the roll out in December.  Meyer asked for an opportunity to work NCA leads. According to company reports, another region with three male sales managers whose teams received 5000 NCA leads per month was converting at less than .005. Meyer suggested that Simons give her team 20% of those leads to see if her more experienced group could convert at a higher percentage. Simons did not like the suggestion and told Meyer in an unprofessional way not to question how things were set up.

33.     After that Simons canceled a few of their scheduled calls or would leave Meyer in the chat waiting and never join. Meyer spoke to Jewkes about her concern for Simons' discriminatory and bullying communications and how angry and unprofessional he was towards

her when she was simply advocating for her team. Jewkes told Meyer to deal with it and that she needed to bring things to Simons and couldn't fear his reaction.

34.     In February 2022, during Meyer's monthly check in with Jewkes, she received an exceeds expectation performance review for 2021.  Meyer did not receive any feedback whether verbal or written about performance issues or quality. At the end of February 2022,  Meyer received an award for her group's performance in January 2022.

35.     On February 25, 2022, Meyer received a call from HR, Simons, and Jewkes. Meyer was informed that she was being terminated or she could accept a demotion to an hourly call center loan officer.  Meyer accepted the position as a loan officer.  After the demotion Meyer was assigned to report to sales manager Anthony Mason, whom she had previously out-performed every month in 2021.  Only one other sales manager remained that exceeded Meyer's tenure and performance.

36.     Meyer continued to receive calls from active sales managers for solutions and trouble-shooting issues. During team calls with Mason, Meyer often had to demonstrate how to use company tools and systems because Mason was not aware of how to use basic functions in the company operating system.

37.     With her demotion, the company canceled Meyer's guarantee contract which still had $50,000 remaining in unpaid commission guarantee and her salary was reduced from $60,000 to $30,000 annually.

38.     Meyer resigned her position on April 1, 2022.  In her resignation letter, Meyer complained that her demotion was a constructive discharge, resulting from gender discrimination and retaliation.  Although the company accepted Meyer's resignation, they never responded to her complaints.

39.     Meyer is aware of other women in the company who were terminated shortly after making complaints regarding discrimination against Simons, Jewkes, and other male employees. Meyer asserts her demotion was a constructive discharge in retaliation for complaining about Simons' gender discriminatory behavior.  Furthermore, Meyer and other female employees have experienced gender discrimination, as well as retaliation for reporting gender discrimination, on the part of Simons, and other male executives at the company.  Their actions have resulted in disparate treatment of female employees at the company.

**C.     Facts Relevant to Palmer:**

40.     Palmer has worked as a mortgage professional since 2016.  She started working remotely for a small brokerage in Southern California and quickly grew to one of the top producing loan officers in the nation, as recognized by Scotsman's Guide, the industry "Who's Who" annual awards publication.  In multiple years, Palmer was also recognized as one of the top 1% of all originators through United Wholesale Mortgage, and one of the top 100 women originators. Palmer is licensed in 11 states.

41.     On March 1, 2021, Palmer was hired by FGMC Senior Vice President Jordan Simons ("Simons").  Palmer was hired in a non-producing role, as a sales manager.  She was tasked to onboard a new team of mortgage loan originators, training them to the same standards  she developed throughout her career; with the goal of transitioning to a Senior Vice President of Sales as a part of a Joint Venture with another company.  Simons promised roll-out of the Joint Venture was delayed numerous times and was ultimately slated for rollout in the third quarter of 2022. Palmer was assigned to report to Senior Vice President Brandon Jewkes ("Jewkes")  in the Henderson Branch.

42.     At the time Palmer started she did not have an assigned team.  Palmer built her team from scratch.  It took forty-five days after Palmer's start date before her first team member was onboarded.   Palmer continued to build her team, hiring six new loan originators after Christmas 2021.  By February of 2022 one-third of her team had less than thirty days experience and only two of her loan originators had worked for FGMC more than six months.   Palmer was confident that her new team was finally in place.

43.     Prior to end of 2021, Palmer had not received any negative management feedback from Simons and Jewkes and had not received any discipline.

44.     One of the candidates Palmer interviewed for a loan originator position during the summer of 2021 was Sidney Elliot ("Elliot").  Palmer chose not to hire Elliot because he was discriminatory and disrespectful during the interview referring to Palmer as "honey" and "sweetheart" and asking inappropriate questions about how she juggled family and work and her family circumstances.  Jewkes was aware of Elliot's conduct and chose to hire him, anyway, assigning him to Anthony Simon's ("Simon") team.

45.     On November 1, 2021, when Simon resigned from FGMC, Jewkes moved Elliot to Palmer's team along with three other low producing loan originators.    During Palmer's first weekly one-on-one with Elliot, he again referred to her as "sweetheart."  Palmer told Elliot that she preferred that he address her as Jessie instead of sweetheart.  After the meeting, Elliot complained to Simons that he did not think he could report to Palmer because "he didn't feel that he could work with a woman."  Simons and Jewkes discussed the request, then conceded to Elliot's discriminatory demand, assigned him to another team and did not provide Palmer a comparable replacement.

46.     Simons and Jewkes failed to uphold FGMC's anti-discrimination policy and also failed to report Elliot's conduct to human resources as required.  Simons told Palmer that he knows he should have fired Elliot but that he was going to move him to another team and give him another chance.  Jewkes offered to give Palmer credit for Elliot's production "for a couple of months" to make up for the loss of a team member.

47.     Following this incident, Jewkes began treating Palmer in a retaliatory and discriminatory manner.  Jewkes began criticizing Palmer regarding minor file issues, such as calling Palmer to task for the quality of her originator's files claiming that she was not reviewing them.  However, Jewkes' criticism was inaccurate.  Palmer confirmed with Andrew Barriga and Steven Starr that her originator's files were consistently clean, accurate and closeable and were on par with the best of Good Mortgage's originators and were the best within the Henderson Branch.

48.     On December 29, 2021, Jewkes failed to support Palmer when she escalated a loan file to him where she felt the processor was not properly following through to obtain income verification.  Instead of supporting Palmer or reviewing the file to understand the issue, Jewkes pushed the file to a different sales manager insinuating that delay was because of Palmer instead of the processor.

49.     On January 11, 2022, Palmer reported several discrepancies in her final production numbers to Tamara Cothran ("Cothran") in Payroll. Cothran informed Palmer that she had no record that Palmer was supposed to receive production credit for any originators outside of her immediate team (Elliot and two loan originators who had recently transitioned off of Palmer's team).

50.     When Palmer looped in Jewkes to confirm that she was supposed to receive credit for these originators, he responded "even if we included Nick, Eddie, and Sydney's total, it doesn't

reach $10MM+ so the net is still zero."   Palmer explained that she wanted her work to be accurately credited and blind copied Simons on the email.  Simons replied, "if adding them does not change the outcome, why create the work for Tamara? This is a commission report not a production report. Or am I missing something and it does change the outcome?"

51.     Palmer responded, "yes, accuracy matters. I don't think it is unreasonable for me to ask to get credit for the work I am doing, even if I don't get paid differently for it. I am disappointed that these reports were not reviewed and amended before they were sent to me, and that I am getting pushback when I ask for this to be corrected. This is important to me because the numbers I am requesting do not show on production reports, either. If I don't get it documented here, it doesn't get documented anywhere. The LO records have gone to the other sales manager when the LO was moved and show on their production reports, not mine. By Tamara's recalculation, I am only $80k from hitting $10m, and every report out there looks like I am not even close. It's not about the outcome, it's about the accuracy."

52.     Jewkes responded to this email by calling Palmer and verbally accosting her for copying Simons.  Jewkes told Palmer she had no business adding Simons to the conversation  and that she should only address her concerns to him. Jewkes made it clear that Palmer had overstepped a boundary, that she was perceived as weak, and that Simons had more important things to do with his day than respond to Palmer's "problems".

53.     Palmer felt threatened and intimidated for adding Simons into an email regarding a payroll issue that only he had the authority to amend. She also felt that she was not allowed to reach out to other managers regarding future matters, without fear of retribution from Jewkes. This is in direct conflict with FGMC's open door policy.

54.     On January 13, 2022, Palmer emailed Jewkes and Human Resources regarding the resignation of Frank Bueno, as required by FGMC policy. Palmer warned Jewkes and Human Resources that they may lose other team members in the future because of Bueno's departure. Jewkes responded by berating Palmer for including Human Resources in the conversation. Palmer asked Jewkes to call her to discuss his concerns. Jewkes reached out to Palmer within moments, and yelled at her for looping in HR.  Jewkes stated that it made her look weak and like she could not control her team. He then went on a tirade for several minutes, hashing up several issues that were not pertinent to the conversation, until Palmer started to cry.

55.     Palmer asked Jewkes what she had done to make him hate her so much that he felt he could treat her with such distain.  Jewkes stated that she needed to just "toughen up or quit". Palmer was alarmed and felt intimidated and threatened.  Jewkes was unwilling to engage in a constructive conversation and no longer valued her contributions.

56.     On or about January 13, 2022, Palmer met with Manager of Human Resources, Cassandra Mills ("Mills") and reported Simons and Jewkes' discriminatory and retaliatory behavior.   Mills asked Palmer to provide a written incident report.

57.     On January 19, 2022, Palmer submitted a written incident report with supporting documentation to Mills.  The next day, Mills called Palmer on Teams and said in light of Palmer's complaint, "we want to move you to Paul Graham's team and get you out of this situation during the investigation."  Palmer asked what this would mean for her team, would her team move with her or would she be assigned a new team and how would she be compensated.

58.     Mills was not sure how Palmer's team would be handled and asked Palmer to give her until Monday to "sort this out".  On Monday, January 24,  Mills changed her mind and told

Palmer "we will keep you there during the investigation."  Mills instructed Palmer to not have any further conversations with Jewkes during the investigation.

59.    Jewkes was scheduled to complete Palmer's annual assessment on January 21, 2022.  Palmer told Mills that she was concerned that Jewkes would provide a negative assessment in retaliation for her complaint and asked that the assessment be assigned to someone else.  Mills denied this request but promised to have Senior Vice President of Human Resources, Cassie Vacante attend the assessment with Palmer.

60.    On January 21, Jewkes provided a retaliatory and factually inaccurate assessment.  The assessment contained multiple inaccurate accusations and numerous criticisms that Jewkes had not previously shared with Palmer.  During the assessment Jewkes was dismissive of Palmer's self-assessment and ignored Palmer's feedback and responses.

61.    On January 26, Palmer sent Mills a written response to Jewkes' assessment and complained to Mills that Jewkes used the inaccurate assessment to target her in retaliation for her previous complaints.

62.    On January 28, Mills informed Palmer that after reviewing her complaint,  HR found that Elliot's conduct constituted sex discrimination and should have been reported to HR.  She also told Palmer that HR did not believe that the conduct she reported from Jewkes and Simons constituted retaliation.  Mills further denied Palmer's request to be assigned to a new manager.

63.    Later that day, Mills and Senior Vice President of Sales, Paul Graham, called Palmer and terminated her, allegedly for low sales volume.  Palmer believes that the real basis for her termination was gender discrimination and retaliation for her complaints of discrimination.  This is especially true since she was in a non-producing role, had a brand-new team, the entire Henderson Branch had low sales numbers and Palmer had not previously been warned regarding

the team's sales volume and in light of the close timing to her complaints and the investigation. Upon information and belief, other employees were asked to provide dirt on Palmer so that she could be fired.

64.      Palmer's termination came two weeks after she had reported concerns about Simons. Palmer is aware of other women in the company who were terminated shortly after making complaints regarding discrimination against Simons and other male employees. Palmer believes she was terminated in retaliation for complaining about Simons' gender discriminatory behavior. Furthermore, Palmer and other female employees have experienced gender discrimination, as well as retaliation for reporting gender discrimination, on the part of Simons, Jewkes and other male executives at the company.  Their actions have resulted in disparate treatment of female employees at the company.

## VI.
## CAUSE OF ACTION

### Count One – Title VII and TCHRA- Gender Discrimination on behalf of all Plaintiffs

65.      Plaintiffs incorporate by reference paragraphs 9-62, as if those allegations were set forth verbatim.

66.      At all times material to this action Defendants were "employers" as defined by 42 USC § 2000 b. Defendants are therefore subject to the provisions of Title VII and Chapter 21 of the Texas Labor Code.

67.      Plaintiffs were qualified for their position as demonstrated by their background, training, experience, and performance both before and while working for Defendants.

68.      Through Defendants' supervisors Samples, Smith, Simons and Jewkes, Defendants engaged in a continuing course of discriminatory conduct, Plaintiffs were subjected to negative

treatment, including hostile microaggressions based upon gender, discriminatory and bullying conduct and treatment which was not experienced by male employees.

69.     Defendants provided less opportunities, leads and support to Plaintiffs than were provided to male employees.

70.     Defendants removed responsibilities from Plaintiffs, changed their pay structure and reporting structure because of gender.  Defendants terminated VanSingel and Palmer and demoted Meyer with a significant pay reduction resulting in a constructive discharge.

71.     By terminating Plaintiffs, Defendants took adverse actions against them. Defendants took such adverse actions because of their gender.

72.     Under Title VII and Chapter 21 of the Texas Labor Code, it is unlawful for employers to discriminate against any individual because of their gender.  By terminating Plaintiffs because of their gender, Defendants engaged in unlawful discrimination violation of Title VII and Chapter 21 of the Texas Labor Code.

73.     Defendants' discriminatory actions against women in the company by providing them less resources, holding them to different production standards and terminating them unfairly resulted in disparate treatment of Plaintiffs and other women employed by Defendants.

74.     As a result of the unlawful actions of Defendants as described above, Plaintiffs suffered, and will continue to suffer, actual damages in the form of lost wages and lost employment benefits both past and future.

75.     As a further result of Defendants' actions, Plaintiffs suffered non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.  Plaintiffs are therefore entitled to compensatory damages.

76.     Defendants' actions were done with malice and/or with reckless indifference to Plaintiffs' statutorily protected rights. They are therefore entitled to punitive damages.

77.     Plaintiffs also seeks attorney's fees and costs of suit.

78.     PIMCO is liable to Plaintiffs as a joint employer or integrated employer because they directed the hiring of Brian Hale who worked as a consultant to the FGMC board and directed the hiring of Simons, protected Simons from employee complaints and provided Simons coaching regarding employee treatment.   Additionally, PIMCO through Hale attended all executive meetings, provided input into the hiring of C-suite executives and SVPs, provided executive coaching to Samples, conducted succession planning for FGMC's C-Suite & SVPs, supervised the operations of Finance and Operations, organized the restructuring of all operations and sales compensation plans and in December of 2021, sent analysts to assist in further improvement of FGMC's operations and financial structure.

This guidance on operations directly resulted in FGMC's bankruptcy.

**Count Two--Title VII and TCHRA Retaliation on behalf of all Plaintiffs**

79.     Plaintiffs incorporate by reference paragraphs 9-62, as if those allegations were set forth verbatim.

80.     At all times material to this action Defendants were "employers" as defined by Title VII. Defendants are therefore subject to the provisions of Title VII and Chapter 21 of the Texas Labor Code.

81.     Plaintiffs were qualified for their position as demonstrated by their background, training, experience, and performance both before and while working for Defendants.

82.     Plaintiffs engaged in protected conduct in that each Plaintiff lodged complaints regarding gender discrimination, harassment and retaliation with management or the human resources department.

83.     Defendants removed responsibilities from Plaintiffs, changed their pay structure and reporting structure because of gender.  Defendants terminated VanSingel and Palmer and demoted Meyer with a significant pay reduction resulting in a constructive discharge.

84.     By terminating Plaintiffs, Defendants took adverse actions against them. Defendants took such adverse actions because of their protected conduct.

85.     Under Title VII and Chapter 21 of the Texas Labor Code, it is unlawful for an employer to retaliate against any individual because she has opposed any practice made unlawful by the statute. TITLE VII and Chapter 21 of the Texas Labor Code,  By terminating Plaintiffs in response to their opposition to gender discrimination and harassment, Defendants engaged in unlawful retaliation in violation of Title VII and Chapter 21 of the Texas Labor Code.

86.     As a result of the unlawful retaliatory actions of Defendants as described above, Plaintiff suffered, and will continue to suffer, actual damages in the form of lost wages and lost employment benefits both past and future.

87.     As a further result of Defendants' actions, Plaintiffs also suffered non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. They are therefore entitled to compensatory damages.

88.     Defendants' actions were done with malice and/or with reckless indifference to Plaintiffs' statutorily protected rights.  They are therefore entitled to punitive damages.

89.     Plaintiffs also seeks attorney's fees and costs of suit.

90.     PIMCO is liable to Plaintiffs as a joint employer or integrated employer because they directed the hiring of Brian Hale who worked as a consultant to the FGMC board and directed the hiring of Simons, protected Simons from employee complaints and provided Simons coaching regarding employee treatment.   Additionally, PIMCO through Hale attended all executive meetings, provided input into the hiring of C-suite executives and SVPs, provided executive coaching to Samples, conducted succession planning for FGMC's C-Suite & SVPs, supervised the operations of Finance and Operations, organized the restructuring of all operations and sales compensation plans and in December of 2021, sent analysts to assist in further improvement of FGMC's operations and financial structure. This guidance on operations directly resulted in FGMC's bankruptcy.

### Count Three –Breach of Contract on Behalf of VanSingel

91.     VanSingel incorporates Paragraphs 9 – 62 as though fully set forth herein.

92.     The Employment Agreement is a valid contract between VanSingel and FGMC.

93.     VanSingel performed her duties under the Employment Agreement, tendered performance of, or was excused from performing her contractual obligations thereunder.

94.     FGMC has breached the Employment Agreement by failing to pay VanSingel her 60 days of severance pursuant to paragraph 5b of the Employment Agreement.

95.     FGMC's breach of the Employment Agreement was a producing and/proximate cause of injury to VanSingel.

### VII.
### PRAYER

96.     Plaintiffs respectfully request that this Court grant the following relief from Defendants:

A.   A declaratory judgment, declaring Defendants' past practices herein complained of to be unlawful;

B.   Back pay, front pay, pension benefits, stock options, bonuses, health benefits, and any other relief necessary to compensate Plaintiffs;

C.   punitive damages;

D.   liquidated damages;

E.   compensatory damages;

F.   Prejudgment and post-judgment interest;

G.   Attorney's fees necessary for prosecution of Plaintiffs' claims;

H.   Costs for the prosecution of Plaintiffs' claims, including the costs of expert witness fees; and

I.   Such other general relief to which Plaintiffs show themselves justly entitled.

**VIII.**
**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: August 23, 2022                                    Respectfully Submitted,

_____
Jane Legler
Texas Bar No. 03565820
Christine Neill
Texas Bar No. 00796793
Kyla Gail Cole
Texas Bar No. 24033113

Neill Legler Cole PLLC
3300 Oak Lawn Ave. Ste. 425
Dallas, Texas 75219
(214) 748-7777
(214) 748-7778 (facsimiles)

christine@nlcemployeelaw.com
jane@nlcemployeelaw.com
kyla@nlcemployeelaw.com

**Attorneys for Plaintiffs Meyer and Palmer**


CRAWFORD, WISHNEW & LANG PLLC

By: /s/ *Emily Stout*

**Emily Stout**
State Bar No. 24013581
estout@cwl.law
**Camille Avant**
Texas State Bar No. 24084967
cavant@cwl.law

1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500
Facsimile: (214) 602-6551

**Attorneys for Plaintiff VanSingel**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via electronic filing on August 23, 2022 in accordance with the Federal Rules of Civil Procedure.

/s/ *Emily M. Stout*
Emily M. Stout